# EXHIBIT A

CONFIDENTIAL

1

THIS TRANSCRIPT HAS BEEN DEEMED CONFIDENTIAL
AND PLACED UNDER SEAL

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JENNIFER A. REED, | ) |
| Plaintiff, | ) |
| | ) Civil Action |
| v. | ) No. 05-250 (GMS) |
| | ) |
| J.P. MORGAN CHASE, INC. | ) |
| Defendant. | ) |

Deposition of CHRISTOPHER ALAN DOTTS, taken pursuant to notice at J.P. Morgan Chase, Inc., 500 Stanton Road, Building 1, Newark, Delaware, beginning at 9:20 a.m., on Monday, February 27, 2006, before Terry Barbano Burke, RMR-CRR and Notary Public.

APPEARANCES:

    RONALD G. POLIQUIN, ESQUIRE
Young Malmberg & Howard
  30 The Green
  Dover, Delaware 19901
  For the Plaintiff

    THOMAS K. JOHNSON, II, ESQUIRE
Dechert LLP
  Cira Centre, 2929 Arch Street
  Philadelphia, Pennsylvania 19104-2808
  For the Defendant

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477




WILCOX & FETZER LTD.
Registered Professional Reporters

COPY

1  MR. POLIQUIN: I am going to present what
2  can be marked as Dotts Exhibit 2.
3  (Dotts 2 was marked for identification.)
4  BY MR. POLIQUIN:
5  Q.  I have placed in front of you what has been
6  marked Dotts Exhibit 2. Do you recognize that
7  document?
8  A.  Uh-huh.
9  Q.  Do you want a second to look it over at all?
10 A.  (Pause.)
11 Q.  Mr. Dotts, do you recognize this employment
12 application?
13 A.  Yes.
14 Q.  You actually filled out this application?
15 A.  Yes.
16 Q.  Take a look at the third page, CH 000153
17 stamped on the bottom right-hand side. Do you see what
18 page I'm talking about, Mr. Dotts?
19 A.  Yes.
20 Q.  Under US military and other data, there is a
21 question there concerning ever being convicted of,
22 pleading guilty to, no contest to or entering into a
23 pretrial diversion or similar program concerning any
24 criminal offense.

28

1  A.    Okay.

2  Q.    You answered no to that.

3  A.    Right.

4  Q.    Was that a correct statement of fact?

5  A.    Yes.

6         MR. POLIQUIN:  I am going to mark what

7  will be Dotts Exhibit 3.

8         (Dotts 3 was marked for identification.)

9  BY MR. POLIQUIN:

10  Q.   Have you ever seen this document before?

11  A.   No.

12  Q.   Is that your name on it, Christopher Alan

13  Dotts?

14  A.   Uh-huh.

15  Q.   And is that your correct date of birth,

16  8-24-69?

17  A.   Yes.

18  Q.   Is that your correct Social Security number?

19  A.   Uh-huh.

20  Q.   I believe it's under --

21  A.   Yes.

22  Q.   Do you know why it would say individual has

23  failed to disclose prior arrest data?

24  A.   No.

1  Q.  Have you ever been arrested, Mr. Dotts?

2  A.  Yes.

3  Q.  What were you arrested for?

4  A.  For leaning on a police car.

5  Q.  For leaning. Do you remember what the charge
6  was, actually?

7  A.  I'm trying to think. Disorderly conduct or
8  something of that effect.

9  Q.  Did you go to court for that charge?

10 A.  Yes.

11 Q.  What happened at court?

12 A.  It was expunged, it was thrown out.

13 Q.  It was expunged or was it thrown out?

14 A.  It was --

15 Q.  I'm not trying to trick you.

16 A.  No. It was expunged.

17        MR. JOHNSON:  He --

18        MR. POLIQUIN:  We can get through. It is
19 not going to take very long.

20        MR. JOHNSON:  The way we lawyers use
21 expunged may differ from how he is using expunged.

22 BY MR. POLIQUIN:

23 Q.  Were you convicted of that offense?

24 A.  Yes.

1   Q.   Is what you're trying to say that you later
2   had it expunged off your record?
3   A.   Yes.  30 days later.
4   Q.   And where did this take place?
5   A.   In the Chase parking lot.
6   Q.   In the Chase parking lot.  When did it take
7   place at the Chase parking lot?
8   A.   2004, August of 2004.
9   Q.   What exactly took place at the Chase parking
10  lot in August of 2004?
11  A.   I was eating my lunch in my car, the police
12  officer came up and slammed his brakes in front of me.
13  He thought I was stalking the building.  Came over to
14  me trying to yell at me like I was a child, when I
15  explained I was eating my lunch.
16       He seemed a bit aback that I wasn't
17  intimidated by his act, so I wanted to know his name,
18  followed him over to his car.  He wouldn't give it to
19  me.  I leaned over to look at his name, and he told me
20  I was under arrest for leaning into the car.
21  Q.   Let's slow down a bit.  This happened in
22  August of 2004?
23  A.   Uh-huh.
24  Q.   Were you currently employed by Chase at the



1  time?
2      A.    Absolutely.
3      Q.    What was your employment then?
4      A.    I'm sorry?
5      Q.    What were you employed as?
6      A.    I was in decision lending, decision.
7      Q.    Decision lending?
8      A.    Uh-huh.
9      Q.    Do you know what date this happened?
10     A.    I don't. I know it was the end of August.
11     Q.    Where were you working, what building were you
12  working at the time, of Chase's?
13     A.    200 White Clay Center.
14     Q.    You say you were on your lunch break?
15     A.    Yes.
16     Q.    You were in the parking lot of 200 White Clay
17  Center eating your lunch?
18     A.    Yes. Finishing my lunch.
19     Q.    And a police officer came over to you at that
20  time?
21     A.    Yes.
22     Q.    What did that police officer say to you?
23     A.    He came up and yelled that he wanted my
24  identification, my license, whatever. So I gave him

32

1  everything I had, but was sort of bewildered.  I just
2  didn't know what to do because I never had any type of
3  record, didn't even have any points on my license.
4      Q.   So your testimony here today is you were
5  simply eating lunch?
6      A.   Yes.
7      Q.   Was it outside of your car or in your car?
8      A.   In my car.
9      Q.   You were eating lunch in your car and a police
10 officer confronts you?
11     A.   Yes.
12     Q.   The police officer asks for your ID and
13 license?
14     A.   Yes.
15     Q.   And then you gave it to him, your
16 identification?
17     A.   I gave him my license and my badge for the
18 work.
19     Q.   What did he do after that?
20     A.   He went to his car, called it in to find
21 out -- or type it in, whatever it is they do to check.
22 I told him as he went away, you're not going to find
23 anything, just like I told you, I don't have any
24 record, I don't even have any points on my license.

33

1  I'm sitting here eating my lunch like I do every day.
2  I don't know what your problem is.
3          So he went over, came back. On his way
4  back, I stood up out of the car and he said, You need
5  to drive a car more your age. Threw the license at me.
6  I was irate at that point. I asked what his name was.
7  I said I was going to report him. I was going to
8  report it to his manager or his sergeant, whatever it
9  is.
10          And he walked around the car. He
11 wouldn't stop, wouldn't give me his name. Got in the
12 car and I went to follow him and I went to lean, I kept
13 leaning over outside the car to see what his name was,
14 but I couldn't see it. He just said that he'll just,
15 you know, go back, whatever. And I said, no, I need
16 your name. I want to call. This is harassment. I
17 don't know where you get off just doing this.
18          As I leaned in the car to look at the
19 name, I touched the car, so it was, at that time he
20 stated that I assaulted the car. Jumped out of the
21 car, ran over and --
22    Q.   Why were you so angry that a police officer
23 asked for your identification?
24    A.   I wasn't angry he asked for my identification.

34

1  I was angry he could assume what car I can drive in the
2  United States of America.
3     Q.    Did he make any other statements concerning
4  your car?
5     A.    Oh, he did, that's why he came over to me,
6  because of my car.
7     Q.    What car were you driving?
8     A.    I was driving a Ford Focus.
9     Q.    Was there anything particularly distinguishing
10 concerning this Ford Focus?
11    A.    It was an SVT edition, which is basically the
12 bigger rims.  It's more of a performance package for
13 handling and things of that nature.  It's lower, had
14 the painted rims.  So it looked very sporty, but it
15 also got 30 miles to the gallon and I lived in
16 Maryland.
17    Q.    So you felt that he had approached you because
18 of the type of vehicle you were eating your lunch in?
19    A.    Yes, yes.  I know that's what he did.  And
20 then he made up some bogus story once I got over there
21 to save his -- from saving me from putting a complaint
22 against him.
23    Q.    And he charged a complaint of disorderly
24 conduct against you?

Christopher A. Dotts - CONFIDENTIAL

35

1   A.   Yes. And then resisting arrest. Because as I
2 sat there with my hands up in the air asking what I
3 did, he told me I was resisting arrest. And I'm just
4 sitting with my hands in the air like trying to reason
5 with him, which was, at this point, I understand, just
6 doesn't work.
7   Q.   Do you know what the police officer's name is?
8   A.   No, I don't.
9   Q.   Were you handcuffed?
10  A.   Yes.
11  Q.   What happened after you were handcuffed?
12  A.   He took me to the holding cell and booked me.
13  Q.   The two charges that you were booked for were
14 resisting arrest and disorderly conduct?
15  A.   I believe so, yes.
16  Q.   What are the status of those charges
17 currently?
18  A.   They're expunged.
19  Q.   Did you go to trial?
20  A.   Yes. I did a plea like the game goes.
21  Q.   What did you plead to?
22  A.   Guilty.
23  Q.   What did you plead guilty to?
24  A.   Those two items. The judge gave me 30 days

36

1  probation and then my attorney told me that we'd
2  file --
3             MR. JOHNSON:  Objection to the form --
4  I'm sorry.  You don't have to reveal to him what your
5  attorney said to you in confidence.
6             THE WITNESS:  I'm sorry.
7             MR. JOHNSON:  I'm not your criminal
8  lawyer, but the privilege still abides.
9  BY MR. POLIQUIN:
10     Q.    You can waive privilege if you want.  That's
11 okay.
12            You get charged with, it is August of
13 2004 --
14     A.    Uh-huh.
15     Q.    You don't remember the exact date?
16     A.    No.
17     Q.    You get charged with disorderly conduct and
18 resisting arrest?
19     A.    You're right.
20     Q.    Did you go to Court of Common Pleas?
21            MR. JOHNSON:  Objection to the form.
22 BY MR. POLIQUIN:
23     Q.    Those were two misdemeanors; is that correct?
24     A.    Yes.

1  Q.  And you pled guilty to both of those?
2  A.  Yes.
3  Q.  Do you know when you pled guilty?
4  A.  No.
5  Q.  Was it in 2004?
6  A.  I believe. The end of 2004.
7  Q.  Were there any witnesses to this incident?
8  A.  No.
9  Q.  Was there anyone around you when this
10 happened?
11 A.  No.
12 Q.  You said you were given 30 days probation?
13 A.  Yes.
14 Q.  Do you know what level probation you were on?
15 A.  It wasn't a level. It was just regular
16 probation. I don't know.
17 Q.  You don't know what level it is?
18 A.  (Witness shakes.)
19 Q.  Did you have a probation officer?
20 A.  No.
21 Q.  You said it was later expunged?
22 A.  Yes.
23 Q.  How was it expunged?
24         MR. JOHNSON: Objection to the form. If

38

1  you know.
2           THE WITNESS: I applied to have it
3  expunged, I assume. I'm not an attorney.
4  BY MR. POLIQUIN:
5     Q.   Do you have any record of it being expunged?
6     A.   Yes.
7     Q.   What does that paper actually say?
8     A.   You mean the letter from my attorney?
9     Q.   No. Is it a court document?
10    A.   Yes.
11    Q.   What does the court document state?
12    A.   I don't know.
13    Q.   Does it say the convictions were expunged?
14    A.   Yes. Once again, perfect.
15    Q.   Can you repeat that last answer, I'm sorry?
16    A.   My criminal history is once again perfect.
17    Q.   How long after August 2004 was it expunged?
18    A.   I don't know.
19    Q.   Did anyone else participate in your
20 expungement other than your attorney?
21    A.   No.
22    Q.   Did you have to go to a hearing concerning the
23 expungement?
24    A.   No.

Christopher A. Dotts - CONFIDENTIAL

39

1   Q.  Did you sign anything pertaining to your
2 expungement?
3   A.  I don't think so.  I don't remember.
4   Q.  After you got served your 30 days probation,
5 did you sign any legal documents concerning your
6 expungement?
7           MR. JOHNSON:  Objection.  Asked and
8 answered.  Also objection to the form.
9           THE WITNESS:  I have no idea.
10 BY MR. POLIQUIN:
11   Q.  Did you take any actions whatsoever concerning
12 your expungement after your 30 days probation?
13           MR. JOHNSON:  Objection to the form.
14           THE WITNESS:  Yes.  You have to initiate
15 it, so I contacted my attorney.
16           MR. JOHNSON:  Don't reveal any
17 conversation you had with your attorney.
18           THE WITNESS:  I was going to say she did
19 her job.
20           MR. JOHNSON:  That's fine.
21 BY MR. POLIQUIN:
22   Q.  Did you file something to get your record
23 expunged?
24   A.  I didn't file anything.

W&F
WILCOX & FETZER LTD.
Registered Professional Reporters